IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

TERENCE SANDY MCCRAY,

                    Petitioner,

          vs.

MICHAEL CAPRA, Superintendent, Sing
Sing Correctional Facility,

                    Respondent.

No. 9:15-cv-01129-JKS

AMENDED MEMORANDUM DECISION

        Terrence Sandy McCray, a New York state prisoner proceeding *pro se*, filed a Petition

for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. McCray is in the

custody of the New York State Department of Corrections and Community Supervision and

incarcerated at Sing Sing Correctional Facility. Respondent has answered the Petition, and

McCray has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

        On June 3, 2009, McCray was charged with rape in the first degree in an indictment

alleging that he had engaged in sexual intercourse with a woman by forcible compulsion. On

direct appeal of his conviction, the Appellate Division of the New York Supreme Court

recounted the following facts underlying the charges against McCray and the evidence presented

at trial:

>         Many details are undisputed. [McCray], then 40 years old, first met the
> victim—an 18–year–old woman with an extensive history of psychiatric problems—at a
> bus stop in the City of Albany in April 2009. They talked extensively about various
> topics, including sex, while walking together until they eventually visited a recreational
> vehicle that belonged to a friend of [McCray]. The victim testified that, while inside the
> vehicle, [McCray] gave the victim a back massage, but nothing else happened of an
> intimate nature. [McCray's] version of these events differed only in that he testified that,

following the massage, the victim engaged in oral sex with him. Upon parting that night, the victim gave [McCray] her telephone number and they spoke on the telephone a few times in the weeks ahead. On May 26, 2009, [McCray] called the victim and invited her out for the evening. The victim's mother drove her to [McCray's] residence, where the victim met members of [McCray's] family, and she then dropped the pair off on Lark Street. They walked around for a while and stopped at the home of [McCray's] friend, Marvin Calhoun, where they visited with Calhoun and his family. The victim admits that she exchanged sexual innuendos with [McCray] during this visit. After a few hours, the couple left, ending up at the apartment of another one of [McCray's] friends, Kevin Johnson, where they engaged in consensual kissing and fondling.

It is at this point that the testimony of [McCray] and the victim sharply diverges. The victim testified that after about 15 minutes, [McCray] wanted to have intercourse but she refused, telling him it was too soon in their relationship. When [McCray] continued to insist, she became angry with him and left the apartment. [McCray] caught up with her on a street outside the apartment and apologized to her. She stated that they continued to argue while they walked, but that she tired of walking so they sat down. The victim stated that, while seated, they witnessed police officers draw their weapons on a young female with a baseball bat. She explained that this incident made both her and [McCray] laugh, and she no longer felt angry with him.

[McCray] testified that the victim had unsuccessfully asked Calhoun if they could use a bedroom to have sex while visiting Calhoun's family and, once at Johnson's apartment, she initiated sex and it was he who refused to have intercourse there because he thought it was not appropriate to have sex on the couch with his friend in the next room. He testified that they left the apartment together in search of another place to have sex, and that the victim was willing even to have sex outside in the bushes. [McCray] further stated that the victim was not angry with him when they left Johnson's apartment and that they never witnessed the police encounter with the female with the baseball bat.

By both accounts, the couple eventually ended up at an abandoned house located at 595 Clinton Avenue in Albany, where the victim followed [McCray] through the backyard into the house. At this point, the accounts of the victim and [McCray] again diverge. The victim testified that [McCray] backed her up against a wall and started to forcibly kiss and grind against her. She testified that she pushed him away and told him to stop, but that he continued, telling her, "You are going to give it to me or I'm going to take it." The victim stated that they struggled; she punched [McCray] in the face, near his jaw or chin, and [McCray] hit her in the face several times and choked her. While he was choking her from behind, the victim testified, she was able to bite his forearm. After an extended struggle, during which the victim tried to make noise to draw attention and begged for her life, she gave up and submitted to sexual intercourse with [McCray]. The victim stated that, when it was over, [McCray] did not prevent her from leaving, but told her, "Don't go out there looking like that." The victim stated that she wiped the tears and blood off of her face onto her shirt, then went out the same way they had entered. She further testified that she got caught on a fence while trying to leave, and ripped her shirt. She came upon a pay telephone and called 911. Police officers arrived and she was

brought to the hospital for examination. The victim's torn shirt and photographs of her bruised face were admitted in evidence at trial.

By contrast, [McCray] testified that the couple had consensual intercourse once inside the abandoned building. He explained that after they were through and he asked the victim if she wanted to go home, she suddenly demanded money from him and, when he refused, grabbed his pants and began to leave. [McCray] stated that he then tackled the victim to prevent her from leaving and her face struck the floor as they fell. They then struggled as he attempted to pry his money—which the victim had by then extracted from the pocket of his pants—from her hand and, during the struggle, she bit his arm. According to [McCray], he eventually managed to squeeze the victim's hand open and retrieve his cash, at which point the victim got up and left the building.

[McCray] then went to the home of his friend, James Close, where, according to Close, he pounded on the door, yelling for admittance. Close testified that [McCray] looked like he was being chased by someone and implied that he wanted to come inside because there was a female outside who was exposing herself to [McCray]. [McCray] testified that he went to Close's house because he wanted to tell him about his encounter with the victim but, suddenly realizing that the abandoned house he had been trespassing in might belong to Close, changed his mind and left. He explained that he might have referred to the victim as "the girl [who] lifted her shirt up on Central Avenue that time" because he had told Close about his first meeting with the victim and that she had exposed herself on the street that night to some passers-by.

*People v. McCray*, 958 N.Y.S.2d 511, 514-16 (N.Y. App. Div. 2013).

McCray filed a pre-trial discovery demand seeking medical, psychiatric, and related medical records of each prosecution witness on the ground that such information could bear on testimonial capacity, memory, or credibility. At a court appearance on August 27, 2009, the prosecutor appeared before the court and indicated that she had disclosed to the defense information related to the victim's mental health history. The prosecutor further stated that there were three prior incidents in which the victim had alleged sexual assault; she had reported only one of those to the police. Defense counsel asked the trial court to require the People to disclose all of the victim's mental health records. The trial court ordered the People to obtain the records and to submit the records to the court for *in camera* review.

On November 4, 2009, the court informed the parties that it had reviewed the psychiatric records and would disclose to the defense those records that would relate to fabricating or misperceiving events or that showed delusional behavior on the part of the victim. On December 17, 2009, the court released to the defense 28 pages from the over 5000 pages submitted for *in camera* review.

At the conclusion of trial, the jury convicted McCray of first-degree rape as charged. The court subsequently sentenced him as a second felony offender to a determinate imprisonment term of 22 years, to be followed by 5 years of post-release supervision.

Through counsel, McCray appealed his conviction. The Appellate Division affirmed the judgment against McCray in a reasoned, published opinion issued on January 17, 2013. *McCray*, 958 N.Y.S.3d at 528. Two justices dissented, stating their belief upon review of the undisclosed medical records that, "[b]y not disclosing [the complainant's medical] records, County Court deprived [McCray] of the ability to fully prepare his defense, in violation of his 6th Amendment rights to confront and cross-examine the key adverse witness." *Id.* at 527 (McCarthy, J., dissenting). McCray was granted leave to appeal to the New York Court of Appeals and was represented by counsel. On May 1, 2014, the Court of Appeals affirmed the order of the Appellate Division in an opinion indicating that it had performed its own review of the undisclosed records. *People v. McCray*, 12 N.E.3d 1079, 1083 (N.Y. 2014). Three judges dissented on the ground that the trial court abused its discretion by "[t]he denial of additional medical records providing evidence that could serve as a basis for the jury to disbelieve the complainant's version." *Id.* (Rivera, J., dissenting). McCray moved for re-argument in the

Court of Appeals, which was denied without comment on September 18, 2014. *People v. McCray*, 18 N.E.3d 749, 749 (N.Y. 2014).

McCray then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on September 15, 2015. *See* 28 U.S.C. § 2244(d)(1)(A). On August 31, 2017, this Court issued an initial memorandum decision denying the majority of McCray's claims. Docket No. 46; *McCray v. Capra*, No. 9:15-cv-01129, 2017 WL 3836054 (N.D.N.Y. Aug. 31, 2017). The Court concluded, however, that McCray had raised a serious claim for relief with respect to his contention that the trial court erroneously and prejudicially failed to disclose portions of the victim's mental health records that bore on her credibility (Ground 4 and Arguments 6, 6a, and 7 in Attachment(1)). Docket No. 46 at 33; *McCray*, 2017 WL 3836054, at *16. The Court determined that further briefing on that issue was necessary for a just determination and that the interests of justice required the appointment of counsel for McCray solely with respect to submitting additional briefing on that issue. Docket No. 46 at 34; *McCray*, 2017 WL 3836054, at *16. The Court therefore appointed counsel for McCray and ordered additional briefing from the parties. Docket No. 46 at 34; Docket No. 47; *McCray*, 2017 WL 3836054, at *16. The additional briefing is now complete, and the remaining claim is ripe for adjudication.

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, McCray raised a number of claims previously considered and rejected by this Court (Claims 1-3 and 5-9). Claim 4 has now been fully briefed and is ready for consideration.

### III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). Where there is no reasoned decision of the state court

addressing the ground or grounds raised on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues de novo on the record before it. *See Dolphy v. Mantello*, 552 F.3d 236, 239-40 (2d Cir. 2009) (citing *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)); *cf. Wiggins v. Smith*, 539 U.S. 510, 530-31 (2003) (applying a de novo standard to a federal claim not reached by the state court). In so doing, the Court presumes that the state court decided the claim on the merits and the decision rested on federal grounds. *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989); *see also Jimenez v. Walker*, 458 F.3d 130, 140 (2d Cir. 2006) (explaining the *Harris-Coleman* interplay); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810-11 (2d Cir. 2000) (same). This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference); *Jimenez*, 458 F.3d at 145-46. Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.     Grounds 1-3, 5-9

This Court issued an initial memorandum opinion denying these claims; nothing has altered the Court's conclusion that these claims are meritless, and they therefore remain denied for the reasons expressed in that memorandum opinion and order dated August 31, 2017. Docket No. 46; *McCray*, 2017 WL 3836054, at * 4-16. That opinion is incorporated by reference herein as if fully set out.

B.    Ground 4 *(Non-disclosure of Victim's Mental Health Records)*

In this remaining claim, McCray argues that his conviction was unlawfully obtained by the failure of the prosecution and trial court to disclose the entirety of the victim's mental health records. *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny require the prosecution to disclose material[1] information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) (applying *Brady* principles on direct review of a defendant's conviction for sexual assaults against his minor daughter).  "To establish a *Brady* violation, a petitioner must show that (1) the undisclosed evidence was favorable to him; (2) the evidence was in the state's possession and was suppressed, even if inadvertently; and (3) the defendant was prejudiced as a result of the failure to disclose." *Mack v. Conway*, 476 F. App'x 873, 876 (2d Cir. 2012) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  Under these principles, a *Brady* violation occurs only where there is a "reasonable probability" that a different verdict would have resulted from disclosure of the information that the defendant claims was suppressed.  *Strickler*, 527 U.S. at 281.  That is, "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines

----

[1]    As the Second Circuit has explained, the *Brady* Court appeared to use "'material' in its evidentiary sense, *i.e.*, evidence that has some probative tendency to preclude a finding of guilt or lessen punishment." *United States v. Coppa*, 267 F.3d 132, 141 (2d Cir. 2001).  As discussed below, the Supreme Court has subsequently disavowed such contention and made clear that evidence is material in the *Brady* context only if "its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985); *Ritchie*, 480 U.S. at 57 (1987) (using the *Bagley* standard of materiality to define the scope of a *Brady* disclosure obligation).  Moreover, the Supreme Court has explicitly stated that the *Brady* requirement, as enunciated in *Bagley*, "requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678. Notably, the Supreme Court has recently suggested that, in considering materiality under *Brady*, courts should consider whether the undisclosed evidence would lead to a different result, including a hung jury. *See Turner v. United States*, 137 S. Ct. 1885, 1898 (J. Kagan, dissenting (stating that all members of the Court, including the majority and the dissent, "agree on the legal standard by which to assess the materiality of undisclosed evidence for purposes of applying the constitutional rule: Courts are to ask whether there is a "reasonable probability" that disclosure of the evidence would have led to a different outcome—*i.e.*, an acquittal or hung jury rather than a conviction").

As discussed above, after the prosecution informed the defense that the victim had been diagnosed with mental health issues, the defense filed a pre-trial discovery demand seeking medical, psychiatric, and related records of the victim and asked the trial court to require the People to disclose all of her mental health records. The trial court ordered the People to obtain the mental health records and submit them to the court for *in camera* review.[2] Docket No. 35-1 (SEALED) at 213. At a subsequent hearing held on November 4, 2009, the court indicated that it had reviewed the documents and "indicated anything that would relate to her fabricating, misperceiving, delusional, anything in that regard [the court] would turn over." Docket No. 35-1 (SEALED) at 215. The court further stated, "beyond that I was not aware of any authority to just

---

[2]     The record before this Court indicates that the records the court reviewed *in camera*, with the exception of those ultimately disclosed to the defense, were lost or destroyed prior to the state court appeal. Docket No. 35-1 (SEALED) at 27 n.2. Appellate counsel moved for the record to be re-created, and the county court re-subpoenaed the providers and collected the mental health records. *Id.* Two providers were not able to be located or subpoenaed. *Id.* With the exception of those records, the parties believed that the records submitted to the Appellate Division and the Court of Appeals on direct appeal included all documents the county court reviewed prior to trial. *Id.*

turn over psychiatric records with regard to mood disorder, other things and I invite you to refer me to any cases that would show a contrary result." *Id.* at 15-16.[3] On December 17, 2009, the court submitted to defense counsel "copies of medical records . . . that are pertinent to this case." Docket No. 35-1 (SEALED) at 192. The disclosure totaled 28 pages of medical records[4] from the thousands of pages submitted for review. Docket No. 35 (SEALED) at 431-50; Docket 35-1 (SEALED) at 1-8.

The record does not indicate that any expert witness for either party testified as to the complainant's mental health history or regarding the possible significance of her diagnoses or the medications she took on her memory or possible reasons why her testimony might be suspect.[5]

---

[3]     Although not part of the trial transcript, correspondence between the parties and the court, which is part of the record before this Court, indicates that, at a subsequent hearing on or about November 13, 2009, the court indicated that it would "turn over all of the subpoenaed records to [defense counsel] for [his] examination and consultation with one or more experts, if deemed necessary." Docket No. 35-1 (SEALED) at 188. The People "strongly oppose[d] the release of any mental health or medical records of the victim in this case unless they indicate[d] the victim has a propensity to hallucinate and/or fabricate events." *Id.* at 190. As aforementioned, the record indicates that the court released only a portion of the subpoenaed medical records. *Id.* at 192. The record does not reflect that McCray followed up on the issue of counsel reviewing the medical records with one or more expert mental health professionals, nor does it include any further proceedings in which McCray modified his demand for all records or sought to specify areas of concern. If defense counsel consulted with a mental health expert, there is no record evidence. Generally, where an attorney consults with an expert but does not plan to call the expert as a witness, there is no requirement that the consultation be disclosed.

[4]     The Appellate Division dissenters noted that, of the 28 pages of records disclosed, some are undated and the source or author unidentified. *McCray*, 958 N.Y.S.2d at 524 n.2 (McCarthy, J., dissenting). It does not appear that defense counsel complained to County Court about this or sought further information.

[5]     In his counseled post-trial motion to vacate the judgment alleging ineffective assistance of trial counsel, McCray alleged that the prosecution presented the testimony of Janice Ceccucci, an expert witness, who testified, "in sum and substance, to [the complainant's] credibility gaps. Upon information and belief, Ms. Ceccucci was allowed to ruminate on [the

On direct appeal, the New York Appellate Division issued a divided opinion concluding that, after review of the records, "the court provided an appropriate sample of documents that covers all of the victim's relevant and material mental health issues." *McCray*, 958 N.Y.S.2d at 518. As the majority opinion noted, "[t]he dissent, in performing its review of the victim's mental health records, . . . unearthed some documents that were not disclosed to [McCray] and are relevant to the victim's competence to testify, in particular, references to short-term memory loss, such as her inability to recall events after she has had a temper tantrum, and a suggestion that she forgets good experiences with a person if they are succeeded by a negative experience." *Id.* at 518. The majority concluded that the documents identified in the dissent would have had "limited impact . . . when compared to the amount of material that was disclosed," *id.* at 519, were "redundant in light of those records that were disclosed," *id.*, and contained evidence that would have been inadmissible, *id.* at 520.

The last reasoned decision in this case was by the New York Court of Appeals. *McCray*, 12 N.E.3d at 1079. It is this decision which we may review. *Ylst*, 501 U.S. at 804. As we have seen, this Court may only provide McCray relief if that court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

complainant's] condition, at various times bolstering her testimony and explaining away its deficiencies." Docket No. 35-3 (SEALED) at 21. The record reflects, however, that Ms. Ceccucci, a nurse with forensic training who was tasked with interviewing and examining rape victims, did not testify as to the complainant's mental health history but instead was offered to "explain why a sexual assault victim may not have vaginal or other internal injuries." Docket No. 35-5 (SEALED) at 312. When Ceccucci testified that she did not perform the sexual assault exam on the complainant and had "never even looked at th[e] victim," defense counsel objected, and the court did not allow the proffered testimony. *Id.* at 312-13. The doctor who administered the sexual assault exam did, however, testify and address the significance of the absence of vaginal or internal injuries. Consequently, no expert testified regarding the possible impact the complainant's mental health history might have had on her credibility.

Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The Court of Appeals' decision was not contrary to established Federal law. The Court of Appeals correctly identified applicable law as centered in *Brady* [6] and its progeny. *See McCray*, 12 N.E.3d at 1081-82. The Court of Appeals did not confront a set of facts that were materially indistinguishable from a decision of the Supreme Court but nevertheless arrived at a different result. There is no decision of the Supreme Court that has facts that are materially indistinguishable from this case. The closest case on the facts is *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987). [7]

The question before this Court, therefore, is whether the New York Court of Appeals' ultimate determination in this case—that the medical records which were not disclosed were not material under *Brady* and thus their non-disclosure was not prejudicial—constituted an

_____

[6] As aforementioned, the leading case is *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (establishing that a defendant is entitled to discover information under the control of the prosecution that is favorable to his defense either to help avoid conviction or, if convicted, lead to a favorable sentence). The prosecution must consider a case prospectively and assure that favorable evidence that might in retrospect be material to an unfavorable result is disclosed. *See Coppa*, 267 F.3d at 143.

[7] In *Ritchie*, the Court considered and rejected the Supreme Court of Pennsylvania's decision that, in a case like this, a defendant was entitled to have his attorney review all of a complaining witness's confidential records, with an advocate's eye, to see if there might be information relevant to exculpation or the impeachment of adverse witnesses. 480 U.S. at 51-56. The *Ritchie* court held that the defendant was entitled to have the trial court review the records *in camera* to determine whether relevant information was available, but was not entitled to conduct a fishing expedition through the complaining witness' records himself. *Id.* at 57-58. County court followed this procedure. No Supreme Court decision reaches the next step and determines whether, after an *in camera* review, the trial court committed federal error in limiting the information disclosed. On this point, we must look to more general discussions in Supreme Court opinions addressing unrelated facts. Of course, the more general the rules we are applying, the more leeway the state court has in reaching a "reasonable" application. *Renico v. Lett*, 559 U.S. 766, 776 (2010).

unreasonable application of Supreme Court principles or relied upon an unreasonable determination of the facts.[8]  While the members of the Court of Appeals discussed how individual documents might have affected McCray's jury, it is clear that the court understood that the entire record must be considered, and the judges discussed the totality of the record among themselves and viewed individual documents in context.  In considering the reasonableness of the state court's conclusion, this Court has, like the Appellate Division and the Court of Appeals, conducted an independent *in camera* review of the undisclosed records to assess their value, particularly as they might lend support to the impeachment of the complaining witness.[9]

---

[8]     *Brady* contains its own prejudicial error determination.  *Mack v. Conway*, 476 F. App'x 873, 876 (2d Cir. 2012) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)) ("To establish a *Brady* violation, a petitioner must show that (1) the undisclosed evidence was favorable to him; (2) the evidence was in the state's possession and was suppressed, even if inadvertently; and (3) the defendant was prejudiced as a result of the failure to disclose.").  Under these principles, a *Brady* violation occurs only where there is a "reasonable probability" that a different verdict would have resulted from disclosure of the information that the defendant claims was suppressed.  *Strickler*, 527 U.S. at 281.  That is, "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."  *Bagley*, 473 U.S. at 678.

The materiality question is a mixed question of fact and law.  *See, e.g.*, *United States v. Payne*, 63 F.3d 1200, 1209 (2d Cir. 1995) (quoting *United States v. Rivalta*, 925 F.2d 596, 598 (2d Cir.1991)).  The Court must predict what impact the information contained in the records not disclosed would have on a hypothetical jury as a basis for estimating how the information would have impacted McCray's jury and then exercise legal judgment and determine how that impact would have affected the outcome, if at all.  *See, e.g.*, *Fuentes v. Griffin*, 829 F.3d 233, 249-52 (2d Cir. 2016).

[9]     This Court has paid particular attention to items that were identified by the reviewing courts, particularly the dissents, which were not provided to McCray but which individual judges believed should have been disclosed.  Also, this Court has found one document not mentioned by either appellate court but that it considers important and which is discussed hereafter.

Before addressing that issue, it is necessary to address some preliminary questions. First, as we have seen, this Court may not review pure questions of state law. The dissent identified two areas in which New York state law might differ from Federal law in being more protective of McCray's rights. Federal law provides the minimum protections to which McCray is entitled, but New York law, and particularly New York constitutional law, may provide greater protection.[10] The two areas identified by the dissenters are, first, whether the Confrontation Clause adds additional protection to the defendant's rights under *Brady*. The Court of Appeals rejected this contention and limited its analysis to *Brady*.[11]

The second issue on which the dissenters argued that New York state law was more favorable to defendants concerned the standard for determining when information was "material" under *Brady*. In federal court, materiality is determined under *Giglio v. United States*, 405 U.S. 150, 154 (1972), and requires disclosure of information that is favorable to the accused on the issues of conviction or sentence and might as a reasonable probability undermine confidence in the result. The dissenters point out that New York has rejected the "reasonably probable" statement of the rule in *Giglio* and adopted a "reasonably possible" statement. *See People v. Vilardi*, 555 N.E.2d 915, 920 (N.Y. 1990). The majority agreed with the dissenters on this point.

_____

[10] State courts must give criminal defendants at least the protection afforded by the United States Constitution, but may allow under their own state Constitutions greater protection. *McGrath v. Toys "R" Us, Inc.*, 356 F.3d 246, 250 (2d Cir. 2004) ("State courts are not bound to interpret state laws in accordance with federal interpretations of analogous federal statutes . . . .").

[11] In *Ritchie*, the Court, over dissent by two justices and a concurring justice, held that, in cases like this, the Confrontation Clause does not adds additional protections to pre-trial discovery. 480 U.S. at 54. The *McCray* dissenters noted that many state courts have rejected this limitation and followed the *Ritchie* dissenters under their respective state constitutions. *McCray*, 12 N.E.2d at 1085 (Rivera, J., dissenting). They wished to reach this result under the New York constitution. *Id.*

After careful consideration of these two issues, I am not convinced that federal law and New York law, as envisioned by the dissenters, should make a difference in this case.[12] It is impossible to quantify the distinction between a reasonable probability and a reasonable possibility.[13]

The county court indicated which possible records it considered "material" and provided to defense counsel those which it concluded met its test. The Appellate Division and the Court of Appeals each reviewed all of the medical records and respectively addressed additional items

---

[12] In theory, confidential mental health records may appear analytically different from other evidence which is under Government control and subject to *Brady* disclosure requirements because neither the prosecutor nor law enforcement generally have control over or access to such records. If *Brady* did not apply to confidential records, then the Confrontation Clause might offer access to a defendant where his attorney proceeded directly to subpoening a non-law enforcement government custodian.

The Court of Appeals, however, held that *Brady* does apply. *McCray*, at 1081. This complies with current federal law. *See Fuentes*, 829 F.3d at 247 (2d Cir. 2016) (holding that any confidential information that might lead the defendant to discover material impeaching evidence would be covered by *Brady*). Thus, it is difficult to see how a consideration of the Confrontation Clause could have given McCray anything that *Brady* would not. As Justice Blackmun concluded in concurring in *Ritchie* to make a five justice majority, the *Brady* duty of disclosure recognized in *Ritchie* is ongoing and therefore particularly relevant to potential matters of impeachment which might not be shown to be material until late in the trial after prosecution witnesses had testified. *Ritchie*, 480 U.S. at 65-66 (J. Blackmun, concurring). Justice Blackmun therefore concluded that the *Ritchie* procedure of an *in camera* review by the trial court would uncover anything governed by the Confrontation Clause. *Id.*

[13] There is no way to prove that any undisclosed evidence, if disclosed, would have affected the outcome (this is a conditional contra factual question). We are not permitted to empanel a number of mock juries and test them. What is required is for each judge or justice to consider the entire record, both the evidence actually considered by the jury and the evidence that might have been considered if *Brady* was fully satisfied, and then, on the basis of all of the judge's knowledge, both academic and experiential, each judge should make a judgment as to whether his or her confidence in the outcome is undermined. The only relevant difference is that, in the state Court of Appeals, each judge considers the matter individually and exercises independent judgment and, in the U.S. District Court, the judge must determine whether, on the record, a "reasonable" judge could have reached the state court result.

that each court found arguably favorable to the accused and relevant, but about which the majority and the dissent ultimately disagreed regarding materiality.

For purposes of determining whether the New York Court of Appeals properly applied *Brady* to the complaining witness's medical records, all of the records will be divided into four categories: 1) those documents disclosed to the defense; 2) those documents amplifying the complaining witness's past memory problems that were not disclosed; 3) information regarding a claim the complaining witness made when she was 13 years old that her father had sexually molested her; and 4) a nurse's note not mentioned by any state judge indicating that the complaining witness had "confabulated" stories about staff.

## CATEGORY ONE

The Court of Appeals addressed foundationally all of the mental health information about the complaining witness that was known to defense counsel and the jury:

> The records that were disclosed showed, and the jury was informed at trial, that the complainant had very significant mental health problems. Her diagnoses, as summarized in her own testimony, included "Bipolar, Tourettes, post-traumatic stress disorder, epilepsy." It was also brought out that she suffered from attention deficit disorder and hyper sexuality; that she had reported that she "visualized" or 'sense[d] the presence of" dead people; that she had cut her flesh with sharp objects; that her bipolar disorder caused her "on occasion" to be "explosive and angry" and to "physically strike out at people"; that at the time of the incident she was taking medications, was receiving treatment from a mental health facility, and was also seeing a counselor weekly or biweekly; that she failed "once in a while" to take her medications, and that on the night of the alleged rape she could not remember whether she had taken them that day; that, after the alleged rape and before the trial, she had been hospitalized for an overdose of drugs; and that that was not her first suicide attempt, though she said it was her first "serious" one.

*McCray*, 12 N.E.3d at 1080-81.

CATEGORY TWO

The Court of Appeals explained its reasons for concluding that the Category 2

information was not material as follows:

> It is hard to imagine . . . a juror who could attribute the complainant's testimony here—a claim of rape, made immediately after what [McCray] testified was consensual sex followed by a dispute over payment—to a failure of recollection or a misunderstanding, however susceptible to those failings the complainant may have been. She certainly did not fantasize or misremember that she and [McCray] had a violent encounter: they both had the wounds to prove it. And their descriptions of that encounter are so starkly different that if one version is not a lie, the other must be. With one possible exception, which we discuss below, there is nothing in the undisclosed records suggesting that the complainant had a tendency to make accusations she knew to be false.

*Id.*

CATEGORY THREE

Category 3 refers to a discussion in the complaining witness' mental health records about

a disclosure made by the complaining witness to a health professional when she was 13 of an

alleged incident of sexual abuse by her father. The record indicates that the complainant's

mother denied that such abuse had occurred and the treating professionals discounted it.[14] Under

New York law, a pattern of false accusations of sexual assault by a complaining witness  may be

admissible in evidence. *See People v. Gifford*, 720 N.Y.S.2d 876, 877 (N.Y. App. Div. 2001)

(under New York law, a defendant seeking to cross-examine a victim about an alleged unrelated

false accusation against another person is required to demonstrate "both that the accusation was

'indeed false' and that the accusation was 'such as to suggest a pattern casting substantial doubt

on the validity of the charges made by the victim in this instance'" (citations omitted)).  Defense

---

[14]     It should be noted that, at about the same time, claims of physical abuse were investigated and apparently confirmed.

counsel did know that the complaining witness had alleged in the past, apparently to treating health workers, three past cases of sexual assault, none of which is discussed further in the record. *See McCray*, 12 N.E.3d at 1081-83. With the exception of her claim against her father, which her mother and her counselors discounted, nothing in the records suggests that the complaints were untrue. The Court of Appeals considered the complaining witness's statements regarding sexual abuse by her father the strongest basis for defendant's argument on appeal. *Id.* The court noted that the record reflected that the allegation was unfounded without further explanation. *Id.*

The court concluded that the complaining witness's sexual experiences other than with her father were the kind of thing the defense and the jury would infer from the knowledge that she was hypersexual, and therefore were of only marginal relevance to the case. *Id.* The Court considered the claim against her father the most troubling but ultimately considered it not material, reasoning that it occurred in 2004 and was quite different from her claim against McCray:

> It is an accusation of abuse by a family member, made not in a 911 call immediately after the event, but in the course of treatment by mental health professionals. And even if the accusation was not true, nothing in the records indicates that the complainant fabricated it, rather than misinterpreted or imagined something her father had done. It is, as we have said, almost impossible that a jury could think the complainant's accusation in this case to be an honest but mistaken one, as the accusation against her father may have been.

*Id.* at 1083.

## CATEGORY FOUR

Category 4 contains an undisclosed November 20, 2006, Patient Care Activity Report with a handwritten notation indicating that the complainant "confabulat[ed] stories about staff."

Confabulate has been  defined as "fill[ing] in gaps in the memory with detailed accounts of fictitious events believed true by the narrator."  WEBSTER'S NEW WORLD DICTIONARY 291 (3d ed. 1984).  Other definitions offered in the literature are similar:

> the fabrication of experiences or situations, often recounted in a detailed and plausible way to fill in and cover up gaps in the memory.  The phenomenon occurs principally as a defense mechanism and is most commonly seen in alcoholics, especially those who have Korsakoff's psychosis, and persons with head injuries or lead poisoning.  Also called fabrication.

MOSBY'S MEDICAL, NURSING, AND ALLIED HEALTH DICTIONARY 292 (Walter D. Glanze et al. eds., 3d ed. 1990).  Another secondary source defines confabulation as "[t]he filling of memory gaps with detailed stories of imaginary experiences; may result from organic disorders that affect intellectual functioning."  ATTORNEY'S ILLUSTRATED MEDICAL DICTIONARY (Ida G. Dox et al. eds., 1997).  The medical dictionaries and the Diagnostic and Statistical Manual of Mental Disorders[15] thus indicate that confabulation refers to a type of false memory or fabrication made without the conscious intention to deceive.[16]

---

[15]     *American Psychiatric Association*, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (the "DSM-V").  The Second Circuit has recognized the DSM as "an objective authority on the subject of mental disorders."  *Fuentes*, 829 F.3d at 249 (quoting *Fuller v. J.P. Morgan Chase & Co.*, 423 F.3d 104, 107 (2d Cir. 2005)).

[16]     Many of the definitions treat "confabulation" and "fabrication" as synonymous.  *See* Susan M. Chlebowski, M.D., et al., *Confabulation: A Bridge Between Neurology and Psychiatry?*, PSYCHIATRIC TIMES (May 27, 2009), http://www.psychiatrictimes.com/cognitive-disorders/confabulation-bridge-between-neurology-and-psychiatry (explaining that "confabulation has been variously described as a falsification of memory in association with an organically derived amnesia, an extreme form of lying or deception, and 'honest lying'" (footnotes omitted)).  Fabricate is defined as "1. to make build, construct, etc., esp. by assembling parts; manufacture; 2. to make up (a story, reason, lie, etc.); invent."  WEBSTER'S NEW WORLD DICTIONARY 484 (3d ed. 1984).  Where confronted with a question about a matter, a person questioned, even if not suffering from a major mental illness, may fill gaps in the memory with imagined facts.  Dr. Elizabeth Loftus discusses "Maleability of Memory:"

> When we try to remember something that happened to us, these sorts of

The Court of Appeals' opinion makes no mention of this document, and it is not clear whether any of the state court judges came across it in their review of the undisclosed documents. Notably, the word appears in what seems to be a short nursing note rather than in a detailed report following a psychological evaluation, and thus it is not entirely clear whether the author was using "confabulation" as a term of art as it is defined above. Nor is it clear what the writer was describing by the reference to "stories about staff."[17] It is possible that the New York judges simply overlooked this item, which would be understandable in reviewing thousands of nurse's notes. More likely, the judges, both those in the majority and those in the dissent, considered it unimportant. Confabulation is most often associated with people suffering from Korsakoff's syndrome, which is not among the diagnoses given to the complaining witness. More important, confabulated statements are generally not consciously false. In this case, the majority's reason for finding no error in failing to disclose other documents relating to memory problems would apply. The complaining witness made a prompt outcry, a centuries' old mark of

---

"constructive" errors are common. We can usually recall a few facts that probably happened. We make inferences. From these probable inferences, we are lead to other "false facts" that might—or might not—have been true. . . . This process of using inferences and probable facts to fill in the gaps in our memories has been called "refabrication," and it probably occurs in nearly all of our everyday perceptions. We supply these bits and pieces, largely unconsciously, to round out fairly incomplete knowledge.

ELIZABETH LOFTUS, MEMORY: SUPRISING NEW INSIGHTS INTO HOW WE REMEMBER AND WHY WE FORGET 40 (1980). Dr. Loftus's discussion shows the relation between "confabulation" and "fabrication," whether by the mentally ill or ordinary folks in constructing "facts" to fill in gaps in memory. A fabrication, while a construction, in context is not necessarily a conscious deception.

[17]     Importantly, the note does not indicate that the complainant confabulated stories accusing staff of sexual assault. If that were the case, the document would surely qualify as material information under *Brady*.

credibility, and the discrepancies between the two descriptions of their interaction were impossible to dismiss as an innocent misrecollection. One of them had to be lying.

Importantly, this Court does not view each non-disclosed document in isolation; rather, it must assess the materiality of the withheld documents and the possibility that their disclosure would have affected the verdict in this case "in light of the totality of the circumstances." *Bagley*, 473 U.S. at 683. Thus, in determining the materiality of the suppressed evidence, the Court must consider the cumulative effect of all non-disclosed evidence rather than consider each item of evidence individually. *Kyles*, 514 U.S. at 440-41. It was not unreasonable for the Court of Appeal to conclude that the disclosed records provided an "appropriate sample" and sufficient information for the defense to narrow the request to specific areas of concern or consult with a mental health expert regarding the possible significance on her memory of her diagnoses or the medications she took or possible reasons why her testimony might be suspect.[18] *Compare Fuentes*, 289 F.3d at 253 (disclosure of complainant's psychiatric record would have provided defense counsel the only means to seek an expert opinion with regard to the record's indication of other significant mental health symptoms).

---

[18] Notably, the record indicates that, after trial, McCray filed a counseled motion to set aside the verdict pursuant to New York Criminal Procedure Law ("CPL") § 330.30(1) in which he alleged that trial counsel was ineffective for failing to investigate false allegations of sexual assault made by the complaining witness. Docket No. 35-1 (SEALED) at 14. In his *pro se* Petition, McCray likewise alleged in relevant part that counsel was ineffective for failing to investigate the facts of the case. But as this Court noted in rejecting McCray's ineffective assistance claim in the initial memorandum decision, McCray made only vague and conclusory allegations in support of his claim, which were insufficient to warrant granting habeas relief, and did not specifically allege that counsel was deficient with respect to his handling of the request for the complainant's medical records. Docket No. 46 at 24-25; *McCray*, 2017 WL 3836054, at *12.

It is likewise worth noting that there existed a single notation of confabulation in records totaling over 5500 pages and spanning over 5 years of treatment. It is certainly true, as Judge McCarthy recognized in his dissenting opinion in the Appellate Division, that "[t]he question here is not whether County Court should have permitted the defense to enter certain documents into evidence or ask the victim about certain topics at trial, but whether the court should have provided [McCray] certain records that would have allowed the defense to investigate information contained therein to determine if admissible evidence could be gathered or proper questions could be formulated." *McCray*, 958 N.Y.S. 2d at 524 (McCarthy, J., dissenting); *cf. Fuentes*, 829 F.3d at 249-50 (noting that "timely disclosure of [psychiatric record] would have provided defense counsel with an opportunity to seek an expert opinion with regard to the [record's] indication of other significant symptoms, in order to establish reasonable doubt in the minds of the jurors because of [the complainant's] pre-disposition toward emotional instability and retaliation"). But again, the record does not disclose what, if any, investigation the defense undertook regarding the impact her disclosed diagnoses had on her behavior. The Court of Appeals could well reasonably conclude that further information would not have triggered an investigation that the information supplied did not trigger. *Cf. Fuentes*, 829 F.3d at 258 (Wesley, C.J., dissenting) (citing *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam) (reversing Ninth Circuit's grant of habeas relief on *Brady* claim "based on mere speculation" that suppressed polygraph results "might have led respondent's counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized")).

As the majority in the Appellate Division recognized, the universe of undisclosed documents additionally contain "references to short-term memory loss, such as her inability to

recall events after she has had a temper tantrum, and a suggestion that she forgets good experiences with a person if they are succeeded by a negative experience," *McCray,* 958 N.Y.S.2d at 518, which were not presented to the jury.[19] McCray could argue that the document indicating that the complainant had confabulated stories about staff, when viewed in conjunction with those other undisclosed documents that bear on her capacity to testify as required by *Kyles*, 541 U.S. at 440-41, might show a pattern. But, this Court must remain mindful of its obligations under AEDPA deferential review. *See Richter*, 562 U.S. at 102 (criticizing the Ninth Circuit for "treat[ing] the unreasonableness question as a test of its confidence in the result it would reach under *de novo* review" and reiterating "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

This case differs from those in which circuit courts determined that a witness's withheld mental health records and evaluations were deemed sufficiently material to warrant habeas relief. In those cases, the defense was unaware of the witness's mental health issues or the withheld documents revealed information previously unknown or not otherwise discoverable upon further investigation. *See Fuentes*, 829 F.3d at 252 ("In sum, the suppressed psychiatric record provided the only evidence with which the defense could have impeached G.C. as to her mental state and explained why she might have fabricated a claim of rape.); *Browning*, 717 F.3d at 1106, 1108 (holding that evidence of the prosecution's "indispensible" witness's mental health diagnosis, which the trial court withheld in its entirety after conducting an *in camera* review, was material because the reports indicated that the witness had a tendency to "blur reality and fantasy and

---

[19] Notably, an incident where the complainant was found wandering on a highway and not able to remember how she got there was mentioned in one of the documents that were disclosed. Docket No. 35 (SEALED) at 431 (SR 429).

project blame onto others"); *Gonzalez v. Wong*, 667 F.3d 965, 982-84 (9th Cir. 2011) (holding

witness's psychiatric reports, unearthed after trial, to be material where they implicated his

"competency to perceive accurately and testify truthfully"); *Wilson v. Beard*, 589 F.3d 651, 665-

66 (3d Cir. 2009); *Bailey v. Rae*, 339 F.3d 1107, 1116 (9th Cir. 2003) (therapy reports on a

developmentally disabled victim's ability to understand consent produced after trial provided

"[u]nique and relevant evidence" that could not "be characterized as cumulative"). Here, the 28

pages from the complaining witness's mental health records put McCray on notice of her

diagnoses and significant insight into how those diagnoses affected her past behavior. Despite

this knowledge, it is not clear that defense counsel consulted a mental health expert, or if counsel

consulted an expert, what resulted from that consultation. Accordingly, it cannot be said that the

Court of Appeals' determination that the withheld documents were not material was

unreasonable or contrary to *Brady* or its progeny.

C.      Docket 67 (Petitioner's *Pro Se* Supplemental Filing)

At Docket No. 67, counsel for McCray filed on his behalf a letter that the Court construes

as a motion to submit a late-filed reply brief in support of the Petition for a Writ of Habeas

Corpus. In this submission, McCray avers for the first time that the trial prosecutor in his case

urged his mother to encourage McCray to plea guilty to a misdemeanor offense prior to trial and

indicated that the State would be willing to remove the sex offender registration requirement

should McCray enter a guilty plea. Docket No. 67 at 5-6.

The Court declines to consider the submission at Docket No. 67. The record reflects that

counsel for McCray filed a reply memorandum on McCray's behalf on April 20, 2018. McCray

filed his own *pro se* submission on April 27, 2018. McCray's submission is both untimely and

outside the scope of permissible briefing. Moreover, the proposed reply raises a new claim not argued in the Petition and apparently not raised before the state courts. The Court will not consider such claim because a traverse or reply is not the proper pleading in which to raise additional grounds for habeas relief, particularly one that has not been fully exhausted. *Parker v. Smith*, 858 F. Supp. 2d 229, 233 (N.D.N.Y. 2012). The motion at Docket No. 67 must therefore be denied.

## V. CONCLUSION

The Court of Appeals stressed that the complaining witness's prompt outcry, which resulted in the police taking her statement within hours of the event, coupled with McCray's testimony that the two fought but over the complainant's demand for money not the sexual activity, created a dispute that could not have been the product of mistake or faulty memory. Nothing in the medical records concealed was exculpatory. The complaining witness was under the care of mental health professionals at the time of the incident. Her statements at the hospital about the incident were disclosed to McCray and used at his trial to cross examine her. *See McCray*, 958 N.Y.S.2d at 517-18. McCray's *Brady* claim rests entirely on the contention that additional information from her mental health records would have helped with his attempts to impeach her, either by suggesting additional questions he might have asked her or appropriate areas for investigation. Yet McCray's testimony is that she consented to sex but wished financial compensation. Nothing in her records discloses that she ever engaged in prostitution. She testified that she did not reject McCray, which is also indicated by her admitted actions. She further testified that she declined intercourse at that moment because "it was too soon in

their relationship." *McCray*, 958 N.Y.S.2d at 515-16.  Her history is consistent with her desires to have a boyfriend and a lasting relationship.

In determining whether the absence of additional information from the complaining witness's mental health records in this case would have led reasonable judges to lack confidence in the result, we must recognize that, regarding the central issue, the complaining witness and McCray told such specific stories that one of them must have been lying and McCray was seriously impeached.  The trial transcript indicates that the trial court allowed the prosecution to impeach McCray's credibility with a number of convictions relating to crimes of dishonesty, but kept out a number of crimes of borderline admissibility.  *See* Docket No. 35-5 (SEALED) at 22-26.

The positions of the dissenters in the Appellate Division and in the Court of Appeals were not "unreasonable;" a change of one vote in McCray's favor in either court would have given him a victory.  But the reasonableness of the dissenters is not the issue.  Having carefully reviewed the record it is clear that the Court of Appeals did not act unreasonably in finding that McCray had not shown that he was denied "material" information relevant to the complaining witness's credibility.  This Court cannot say that no reasonable judge would have reached the conclusion that the Court of Appeals reached in this case.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the motion at Docket No. 67 is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court grants a Certificate of Appealability solely with respect to McCray's claim that the non-disclosure of the complainant's medical

records violated *Brady* (Ground 4). 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request to expand the Certificate of Appealability must be addressed to the Court of Appeals. *See* FED. R. APP. P. 22(b); 2D CIR. R. 22.1.

**IT IS FURTHER ORDERED THAT** the appointment of counsel shall continue for purposes of any appeal. If counsel wishes to decline the appointment on appeal, he should file a withdrawal request with the Court. Otherwise, counsel should confer with McCray for the purposes of filing an appeal.

The Clerk of Court is to enter judgment accordingly.

Dated: July 24, 2018.

    /s/ James K. Singleton, Jr.       
JAMES K. SINGLETON, JR.
Senior United States District Judge
